Filed 4/15/14  P. v. Vasquez CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CHRIS VASQUEZ,<br><br>    Defendant and Appellant. | B248129<br><br>(Los Angeles County<br>Super. Ct. No. GA084859) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Stan Blumenfeld, Judge.  Affirmed.

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

_____

# INTRODUCTION

Defendant Chris Vasquez appeals from a judgment of conviction entered after a jury trial. The information charged Vasquez with assault with intent to commit a felony during the commission of a first degree burglary (Pen. Code, § 220, subd. (b);[1] count 1), first degree burglary with a person present (§ 459; count 2), assault with intent to commit a felony (§ 220, subd. (a)(1); count 3), and forcible rape (§ 261, subd. (a)(2); count 4). As to count 4, the information alleged that Vasquez committed forcible rape during the commission of a residential burglary (§ 667.61, subds. (a), (d)).[2] The information further alleged that Vasquez had a prior serious felony conviction (§§ 667, subds. (a)(1), (b)-(i), 1170.12) for which he served a separate prison term (§ 667.5, subd. (b)).

The prosecution dismissed count 3 prior to trial. The jury found Vasquez guilty on counts 1 and 4 and found true the special allegation as to count 4. The jury did not return a verdict on count 2 because it was a lesser included offense of count 1. The trial court found true the prior conviction and prison term allegations. The trial court sentenced Vasquez to 25 years to life on count 4, doubled under the three strikes law, stayed sentence on count 1 pursuant to section 654, and imposed a five-year serious felony enhancement, for a total sentence of 55 years to life.

On appeal, Vasquez contends that the trial court committed instructional error by failing to instruct on a lesser included offense, and that the trial court violated his privilege against self-incrimination by failing to suppress statements Vasquez made to the

---

[1] The information did not specify a particular felony, and neither did the jury instructions or verdict form. Because of the forcible rape allegation (Pen. Code, § 667.61, subd. (a)), however, the case was tried on the theory that the felony Vasquez intended to commit was rape.

Statutory references are to the Penal Code unless otherwise indicated.

[2] Section 667.61, subdivision (a), permits imposition of a sentence of 25 years to life for the commission of the offenses specified in subdivision (c), under circumstances specified in subdivision (d). It applies to the commission of rape during the commission of a first degree burglary, with the intent to commit rape. (*Id.*, subds. (c)(1), (d)(4).)

police during a custodial interrogation at his probation officer's office. Vasquez also argues that the prosecutor engaged in misconduct by questioning Vasquez's expert about his hourly rate and the amounts he had billed for his expert services and arguing these issues to the jury, and by referring in closing argument to facts not in evidence. Finally, Vasquez argues that he received ineffective assistance of counsel. We affirm.

## FACTS

### A. *Jenny A. Goes Out for the Evening*

Jenny A. lived with her daughter in a one-bedroom apartment in Burbank. She slept on a bed in the dining room, and her daughter slept in the bedroom.

On May 4, 2011 Jenny and her friend Araceli had plans to attend a jazz concert. Araceli and her children arrived at Jenny's apartment at approximately 8:30 p.m. Andrew, who was the father of Araceli's son and lived next door to Jenny, took Araceli's children and Jenny's daughter to Araceli's house, where Araceli's son would babysit them. Jenny locked her front and back doors when she and Araceli left.

Araceli drove to a restaurant near the concert venue. Jenny had one or two martinis, because Araceli was the designated driver. They walked over to the concert venue. After the concert ended, they went to two bars. Jenny had drinks at both bars and was beginning to feel drunk. About 1:00 a.m. Araceli drove to a drive-thru restaurant and picked up some food. Then she drove to Jenny's apartment and dropped Jenny off by the back door.

### B. *Vasquez Commits the Crimes*

Jenny entered her apartment through the back door and locked the door. She put down the items she was holding and was standing in the kitchen when she realized that someone else was in the apartment. Vasquez grabbed Jenny's arms and began yelling, "You know me. You know me. It's me. You know me. You know me." Jenny responded, "No, I don't. No, I don't know you. I don't know you. No, I don't."

3

The next thing Jenny remembered was waking up on the living room floor with Vasquez on top of her. His penis was in her vagina, and he was kissing her neck and chest. She saw blood at the bottom of the door frame leading into the hallway.

Jenny next remembered that she was in the kitchen, with Vasquez standing in front of her and holding her arms tightly. He yelled at her, "What are you going to say? What are you going to say happened to you? What are you going to do? What are you going to say?" Jenny thought that Vasquez was going to kill her and that her daughter was going to find her dead in the morning. She told Vasquez, "I'm going to say I fell. I'll clean up the blood. I'll go to sleep. I'm not going to tell. I'm not going to do anything." Vasquez kept saying, "You're not going to say anything? But look at your face. Look at your face. There's blood everywhere. Look at your house." Jenny looked and saw blood on the kitchen wall. She kept trying to reassure him that she would say she fell. She touched his arms and felt him tense up. She removed her hands because she was afraid he would kill her.

The next thing Jenny remembered was that she was back on the living room floor and she saw Vasquez leave through the back door. She realized she was covered in blood, and there was blood all over the floor. She was naked except for a tank top and torn blouse. She felt like she was going to pass out but she struggled to get up. She ran next door to Andrew's home and banged on the door. He opened the door, and she fell on the floor. Andrew called the police.

C.     *The Police Investigate the Crimes*

Burbank police officers arrived at Andrew's home at about 3:00 a.m. Jenny was crying and upset and incoherent because she was intoxicated. Jenny gave a statement and said that her attacker had put his penis in her vagina. She was then taken to the hospital.

Jenny's face and head had been "split open," and her hair was soaked in blood. Her forehead, nose, and lips were swollen, and there was blood in her mouth. She had bruises on her hips and arm. The doctors closed her head wound with seven staples and stitched closed a laceration over her eye.

4

Mary Ann Lague, a Sexual Assault Response Team nurse, examined Jenny at approximately 7:00 a.m. Lague did not find any semen on Jenny's body but took internal and external vaginal swabs as well as swabs from Jenny's neck. She did not find any vaginal trauma but testified that about half of rape victims have no vaginal trauma.

After the examination Jenny returned home. She discovered that her bra, panties, cell phone, house keys, and laptop were missing.

Juli Watkins, senior criminalist at the Los Angeles County crime lab, performed DNA analysis on the swabs taken from Jenny and her clothing. Watkins found a small amount of male DNA on the external genital swabs, but there was not enough to identify the contributor. Sperm fractions found on Jenny's neck and tank top matched Vasquez's DNA. The random match probability of someone having the same DNA profile as Vasquez was 1 in 350 quadrillion.[3] Watkins also testified that the absence of male DNA on a woman's vagina could mean that there was no penis insertion, but it could also mean that the man wore a condom.

D. *The Police Interview and Arrest Vasquez*

After learning that the DNA evidence identified Vasquez, Burbank Police Detective Martha Jimenez interviewed Vasquez during a scheduled meeting between Vasquez and his probation officer.[4] Vasquez initially told Detective Jimenez that he had not been to Burbank since July or August 2010, and insisted that he had never seen Jenny, did not know her, and had not had sex with her. Vasquez stated that he was shocked and bummed out, and he was willing to provide a DNA sample—even though he was "already in the system"—and to participate in a lineup. When the police told Vasquez that his DNA matched sperm fragments found on Jenny, Vasquez stated that he had no explanation because he had not been to Burbank. Vasquez said that the only

---

[3]     350 quadrillion is 350 "followed by 15 zeros," or 350,000,000,000,000,000. (*People v. Xiong* (2013) 215 Cal.App.4th 1259, 1277.)

[4]     The People played a recording of the interview for the jury.

possibility he could come up with was that she was "sexually active at the . . . at the spots around Hollywood" where he paid for sex.  The police arrested Vasquez after this interview.

Jenny was unable to identify Vasquez from a photographic lineup.  She was able to identify him, however, at the preliminary hearing and at trial.


E.     *Vasquez Calls His Mother and Implicates Himself in the Crimes*

Vasquez was booked into the Glendale Jail, where all phone calls by inmates were recorded.  Detective Jimenez received recordings of two telephone calls between Vasquez and his mother.[5]

In the first conversation, Vasquez's mother asked Vasquez what had happened.  Vasquez responded, "Nothing.  I failed you."  His mother asked what he did, and he said he was "being accused of raping a woman."  She asked, "And how can that be, then?  Did you do it?"  He responded, "I love you a lot, mom."  She asked him again, and he said, "No, *mom*."  After he again said he had failed her, his mother asked, "And look, Chris, is it certain it was you?"  He told her, "Look, I can't talk about that right now."  She said, "Oh, Chris, my God.  The police came here.  And why are you doing stuff knowing quite well, Chris-?"  He said, "*Mom*, I know that . . . ."

His mother asked if he "already told the judge that, that it was you."  He said, "No, I confessed a little about what happened."  His mother asked if the girl was a Latina.  When he responded that she was not, she said, "You're sick, Chris.  You're sick."  He said, "I think so."  His mother later told him, "I don't know why . . . you didn't deny it.  You should've closed yourself to no, no, no, no."  He told her, "It can't be done, *mom*, they say they found something there, that it was from my blood."

During the second conversation, Vasquez's mother told him he had made "a big mistake."  He agreed it was "such a big mistake, *mom*.  I know, *mom*.  I'm really sad,

---

[5]     The People also played these recordings for the jury.

6

down." She asked, "And is the broad a friend of yours?" He responded, "No. No. She's nothing. . . . That's what the detectives are asking, well, what was I doing there anyway. They want to know what, what I was doing there." His mother asked where he was, and he said, "I was in *Burbank*. The lady lives in *Burbank*. . . ."

After further conversation, Vasquez told his mother, "I'm sad, *mom*. They were not going to let me get out this time." She said, "And how are they going to let you out? Look at what you did. You've done the same shit twice. And did you do anything to the lady?" He said he did not and he was "really sad." She told him, "This, this thing that, it hurt you a lot now. What you did today is worse—" He agreed, and she continued, "Because it's already the same shit twice." He responded, "Yes."

After further conversation, during which Vasquez's mother talked about how ashamed she was and Vasquez said he was afraid he would receive a life sentence, the following exchange occurred:

"[Mother]    And is the lady American, Chris?

"[Vasquez]    Yes.

"[Mother]    And was she, the lady, on the street?

"[Vasquez]    No, she was at her home.

"[Mother]    And why . . . did you go inside her house? Did you go inside?

"[Vasquez]    That's what I'm being asked. Yes. What I was doing inside.

"[Mother]    And . . . how did you get in, Chris?

"[Vasquez]    I went in through the front of the house.

"[Mother]    Was it open?

"[Vasquez]    Yes. That's what they don't understand, why I was inside.

"[Mother]    Oh, Chris, you see, because you were high, Chris. . . .

"[Vasquez]    No, *mom*.

"[Mother]    And why did you go in there, Chris?

"[Vasquez]    I know. I know.

"[Mother]    Chris, what you have done cannot be forgiven, Chris.

"[Vasquez]    I know.

7

"[Mother]    What you have done is hard, Chris.

"[Vasquez]    I know.  That's why, that's why I'm looking at life right now."

F.    *Vasquez's Expert Testifies About DNA*

Marc Scott Taylor is a forensic scientist and director of Technical Associates, Inc., which performs DNA analysis in criminal and civil cases.  Vasquez hired him to review the DNA testing in this case, and Taylor was compensated for his work by the court.  In his testimony, Taylor discussed the trace amounts of male DNA found on the external genital swabs taken from Jenny, the ways in which it could have gotten there, and how it was not possible to identify the contributor from the DNA.  Taylor also testified that if a man has intercourse with a woman without using a condom, even if he does not ejaculate, there would be a transfer of his DNA to the inside of the woman's vagina.

## DISCUSSION

A.    *Failure To Instruct on the Lesser Included Offense of Assault With Intent To Commit Rape*

At the end of the second day of trial, the court noted that some of the crimes charged were lesser included offenses and wondered whether it was appropriate to obtain convictions on the lesser included offenses, citing *People v. Dyser* (2012) 202 Cal.App.4th 1015.  The court asked counsel to address the procedural issue of whether the court should instruct on all of the charged offenses and then dismiss the convictions on the lesser included offenses, or instruct the jury on the lesser included offenses.

The next day the court stated that it would instruct the jury on assault with intent to commit a felony (§ 220, subd. (a)(1)) as a lesser included offense of assault with intent to commit a felony during the commission of a burglary (§ 220, subd. (b)).  In response, the prosecutor moved to dismiss count 3 as duplicative, and the court granted the motion.

The trial court instructed the jury on assault with intent to commit rape while committing first degree burglary (CALCRIM No. 890), burglary (CALCRIM Nos. 1700

8

& 1701), rape (CALCRIM No. 1000), and the section 667.61, subdivisions (a) and (d), sex offense allegation (CALCRIM No. 3178). The court also instructed the jury on attempted rape as a lesser included offense of both rape and assault with intent to commit rape while committing a first degree burglary (CALCRIM No. 460), and on simple assault as a lesser included offense of assault with intent to commit rape while committing a first degree burglary (CALCRIM No. 915). Vasquez contends the trial court erred in failing to instruct the jury on assault with intent to commit rape as a lesser included offense of assault with intent to commit rape during the commission of a burglary, as the court originally indicated it would do.

"'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case. [Citations.]' [Citation.] 'That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged.' [Citation.]" (*People v. Smith* (2013) 57 Cal.4th 232, 239.) "'Under California law, a lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser.' [Citation.]" (*People v. Jennings* (2010) 50 Cal.4th 616, 667-668; accord, *Smith*, *supra*, at p. 240; see *People v. Martinez* (2012) 208 Cal.App.4th 197, 199.)

The duty to instruct on lesser included offenses arises only if there is ""'substantial evidence" [citations], "'which, if accepted . . . , would absolve [the] defendant from guilt of the greater offense' [citation] but not of the lesser."" [Citation.] Evidence is substantial if 'a reasonable jury could find [it] persuasive.' [Citation.]" (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137; accord, *People v. Medina*

9

(2007) 41 Cal.4th 685, 700.) *People v. Dyser*, *supra*, 202 Cal.App.4th 1015, which the trial court cited at the beginning of the discussion on lesser included offenses, held that both burglary and assault with intent to commit rape are lesser included offenses of assault with intent to commit rape during the commission of first degree burglary. (*Id*. at pp. 1020-1021.) The trial court, however, did not instruct the jury on this lesser included offense.

Even assuming that the trial court erred in failing to instruct the jury on assault with intent to commit rape as a lesser included offense, we conclude any such error was harmless. We review an erroneous failure to instruct on lesser included offenses for prejudice according to the standard in *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Beltran* (2013) 56 Cal.4th 935, 955.) "'[U]nder *Watson*, a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.' [Citation.]" (*Beltran*, *supra*, at p. 955.) "'[T]he *Watson* test for harmless error "focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." [Citations.]'" (*People v. Rios* (2013) 222 Cal.App.4th 704, 728.)[6]

Vasquez argues that there is such a reasonable probability here because the commission of a burglary was the weakest element of the prosecution's case. Vasquez

---

[6]     We reject Vasquez' assertion that the federal harmless beyond a reasonable doubt standard in *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 17 L.Ed.2d 705] applies here. Vasquez's reliance on *People v. Thomas* (2013) 218 Cal.App.4th 630 for this assertion is misplaced. In *Thomas*, the trial court failed to give an instruction requested by the defendant, which had the result of relieving the prosecution of the burden of proving all elements of the charged crime beyond a reasonable doubt. This constituted federal constitutional error. (*Id*. at p. 643.) The alleged instructional error here is not a federal constitutional error.

argues that Jenny's testimony "suggested that [he] may have been confused as to where he was and with whom. His repeated statements that Jenny knew him strongly suggested that he may have believed he had entered his own residence or that of a woman he knew at the time he gained access. Also, there were no signs of forced entry which would further support the conclusion that Vasquez entered without any felonious intent but in the belief that he was in a place he was authorized to be."

The evidence Vasquez cites might have supported an instruction on the lesser included offense of assault with intent to commit rape. The jury, however, found true the special allegation as to the rape count that Vasquez "committed the crime during the commission of a burglary, with the intent to commit rape, as defined in [CALCRIM No.] 3178 . . . ." In other words, the jury necessarily found that the assault with intent to commit rape occurred during the commission of a burglary. "Therefore, any hypothetical error was harmless." (*People v. Yeoman* (2003) 31 Cal.4th 93, 129; cf. *People v. Nunez and Satele* (2013) 57 Cal.4th 1, 45-46.)

B.      *Admission of Statements Made During the Police Interview*

At the beginning of trial, the court held a hearing outside the presence of the jury "to address the issue of whether the defendant was in custody for *Miranda*[7] purposes concerning the probation office interview." The court heard testimony from Detective Jimenez that she learned that Vasquez had a scheduled interview at the probation office in Los Angeles. She met with Vasquez and the probation officer in a small room at the probation office. Her supervisor, Sergeant DeSantis, and Detective Medlin were also there. All three were wearing business attire, not uniforms. Vasquez drove himself to the interview in his vehicle, and he gave his consent to a search of that vehicle.

At the beginning of the interview, Detective Jimenez did not handcuff Vasquez, draw her gun, or tell him he was under arrest. She told him several times during the

---

**7**      *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694].

11

course of the interview that he was not under arrest. There was one door to the interview room that initially was open, but was closed after five or ten minutes for privacy and because there was noise outside the room. Vasquez was seated closest to the door, and there was no one between him and the door. At the time of the interview, Detective Jimenez had the DNA evidence linking Vasquez to the crimes. She testified that she was not sure at the beginning of the interview if she had enough evidence to arrest him, but she acknowledged that there was nothing he said in the interview that contributed to the evidence she had against him.

The court also read the transcript of the interview. The transcript showed that at the beginning of the interview, Detective Jimenez asked if they could talk, and Vasquez agreed. She told him she wanted him to understand that he was not under arrest, and he was free to go at any time. Vasquez responded, "I totally understand," and "I just want to cooperate." A little later, Detective Medlin asked if it was okay if the probation officer sat in on the interview, and Vasquez said he was surprised the officers were "letting me know if it's okay or what's not okay." Detective Jimenez then let Vasquez know that she was "conducting an investigation out in Burbank." She asked if Vasquez had any idea why she would want to talk to him about it, and he said he did not.

A short time later, Detective Jimenez repeated that she was investigating an incident in Burbank, and stated, "I just wanted to ask you questions, whether . . . you're involved, or not." Vasquez said he was shocked and willing to cooperate. Detective Jimenez questioned Vasquez about Jenny. During the course of the questioning, Vasquez said he was shocked because he was on probation, so they could "automatically" conduct a "search and seizure." He said, "I'm surprised you guys are giving me a chance," rather than arresting him, "and then I'd be sitting in the County, waiting."

The questioning became more intense, and Detective Jimenez asked Vasquez if there was any reason why his fingerprints would be in Jenny's house or his sperm would be on her body. After again denying that he knew her, Vasquez observed, "You know, first, you guys are making me comfortable, and you guys are . . . throwing details at me, now." Vasquez said he was willing to participate in a lineup and to provide a DNA

12

sample, because he was "already in the system." He added, "I'm surprised you guys haven't arrested me, or something." Vasquez told the detective, "You guys have my DNA, so what do you guys want, you know? Just take me in already, you know?" Someone in the room told him, "Well, you're not under arrest. That's why we told you, when you first came in. And that's the reason why we even asked you if it's okay to close the door, 'cause we don't want you to feel like you're—you're in trouble." Vasquez said he was rattled, and the person said the officers were just trying to get the truth, "not trying to put something on you that you didn't do, okay?"

As Detective Jimenez continued to press Vasquez for an explanation for why his DNA was found on Jenny, he asked, "I'm being charged right now, then, right?" Detective Jimenez said he was not being charged. She then told him, "[Y]ou're not under arrest but . . . I'm gonna let you know that, you know, you're not free to leave, at this point, because we'd like to get some more information."

The trial court concluded that Vasquez was not subject to custodial interrogation until the point that Detective Jimenez told him he was not free to leave. The trial court's ruling was based on the detectives advising Vasquez several times that he was not under arrest and was free to leave, plus "the physical environment . . . as well as the overall atmosphere." The detectives did not threaten Vasquez, they were in civilian clothing, and they did not display their guns. There was no evidence they were physically intimidating; they just sat around a table in the interview room. The court found that it "was not a coercive environment that would trigger *Miranda*."

"On appeal, we defer to the trial court's factual findings supported by substantial evidence and independently determine from the factual findings whether appellant was in custody for *Miranda* purposes. [Citation.] It is settled that *Miranda* advisements are required only when a person is subjected to 'custodial interrogation.' [Citations.]" (*People v. Davidson* (2013) 221 Cal.App.4th 966, 970; accord, *People v. Leonard* (2007) 40 Cal.4th 1370, 1400.) "An interrogation is custodial when 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" (*Leonard*, *supra*, at p. 1400, quoting from *Miranda v. Arizona*, *supra*, 384 U.S. at p. 444.)

13

"Whether a person is in custody is an objective test: the pertinent inquiry is whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. [Citation.] The totality of the circumstances is considered and includes '(1) whether the suspect has been formally arrested; (2) absent formal arrest, the length of the detention; (3) the location; (4) the ratio of officers to suspects; and (5) the demeanor of the officer, including the nature of the questioning.' [Citation.] Additional factors are whether the officer informed the person he or she was considered a witness or suspect, whether there were restrictions on the suspect's freedom of movement, whether the police were aggressive, confrontational, and/or accusatory, and whether the police used interrogation techniques to pressure the suspect. [Citation.]" (*People v. Davidson*, *supra*, 221 Cal.App.4th at pp. 971-972.) The question is whether, under the circumstances surrounding the interrogation, "'a reasonable person in [the] defendant's position would have felt free to end the questioning and leave' [citation]." (*People v. Leonard*, *supra*, 40 Cal.4th at p. 1400; see *People v. Zamudio* (2008) 43 Cal.4th 327, 341.)

Vasquez identifies a number of circumstances that he argues support a finding of custodial interrogation. Vasquez asserts that "he was taken by surprise" by detectives "waiting to interrogate him at the time of a previously schedule meeting with his probation officer," that "[f]ailure to comply would likely result in revocation of probation and potential incarceration," and that he was "taken into a fairly small room, where the door was closed, and he was questioned . . . ." Although the officers told him he was not under arrest, "none of the law enforcement personnel asked if he objected to being interviewed or informed him that his participation was voluntary . . . ."

Vasquez's characterization of the facts is not supported by the record. The record showed that Detective Jimenez asked if they could talk, and Vasquez agreed. The interview room was approximately 15 to 20 feet by 10 feet and the door to the room was initially open; it was closed later for privacy and because of noise outside the room. The detectives did not threaten to revoke Vasquez' probation if he did not agree to speak with them. And as Vasquez acknowledges, the United States Supreme Court held in

14

*Minnesota v. Murphy* (1984) 465 U.S. 420, 430-431 [104 S.Ct. 1136, 79 L.Ed.2d 409] that questioning in a probation officer's office is not, in and of itself, custodial. *Murphy* also notes that the state cannot revoke probation based on a probationer's exercise of his Fifth Amendment privilege. (*Id*. at pp. 437-438.)

Vasquez also claims that once the door was closed, "it would have been apparent to [him] that he was not free to leave." Yet even after he was confronted with the DNA evidence, one of the detectives reminded him "you're not under arrest. . . . And that's the reason why we even asked you if it's okay to close the door, 'cause we don't want you to feel like you're—you're in trouble." Vasquez said he was rattled, and that one of the officers said they were just trying to get the truth, "not trying to put something on you that you didn't do, okay?" Nothing that the detectives or Vasquez said suggested that Vasquez believed he was not free to leave because the door was closed.

Vasquez also points to the fact that the interview moved from general questions to statements that the detectives had evidence linking him to the crime and asking him to explain the evidence. He points out that "'[a]ccusatory questioning is more likely to communicate to a reasonable person in the position of the suspect, that he is not free to leave. [Citation.] General investigatory questioning may convey a different message. [Citation.]' [Citation.]" (*People v. Bellomo* (1992) 10 Cal.App.4th 195, 199.)

It is true that *Miranda* warnings may be required if the questioning becomes "aggressive, confrontational, accusatory, coercive, or sustained . . . ." (*People v. Davidson*, *supra*, 221 Cal.App.4th at p. 973.) However, "the 'shift from investigatory to accusatory questioning can be very subtle . . . .' [Citation.]" (*People v. Bejasa* (2012) 205 Cal.App.4th 26, 40.) When Detective Jimenez indicated that she had evidence linking Vasquez to the crime, she kept asking him for an explanation for how it got there. Nothing in the transcript of the interview indicates she was behaving aggressively or coercively in her questioning. Vasquez expressed surprise that he was not under arrest and offered to participate in a lineup and to provide a DNA sample. The shift from investigatory to accusatory questioning did not immediately turn the interview into a custodial interrogation. (See *People v. Moore* (2011) 51 Cal.4th 386, 402 ["police

15

expressions of suspicion, with no other evidence of a restraint on the person's freedom of movement, are not necessarily sufficient to convert voluntary presence at an interview into custody"].)  Even Vasquez recognized that he was not under arrest.

Despite the factors Vasquez cites in support of his position, we agree with the trial court that he was not subjected to custodial interrogation.  Detective Jimenez told Vasquez more than once that he was not under arrest and he was free to go at any time.  (See *People v. Leonard*, *supra*, 40 Cal.4th at p. 1401.)  Vasquez repeatedly made statements reflecting his awareness that he was not under arrest.  Substantial evidence supports the trial court's conclusion that only when Detective Jimenez told Vasquez that he was not free to leave did the interview become a custodial interrogation for *Miranda* purposes, and the trial court did not err by allowing the prosecution to admit evidence of the probation officer's interview prior to that point in time.  (See *id*. at p. 1400.)

### C.  *Prosecutorial Misconduct*

Vasquez argues that the prosecutor engaged in misconduct by "repeatedly referencing the amount of taxpayer funds paid to the defense expert" and referring to facts not in evidence during argument.  Vasquez argues that he did not forfeit these arguments, even though his attorney did not object, and that, if he did forfeit them, he was denied the effective assistance of counsel.  We conclude there was no prosecutorial misconduct.

#### 1.  References to the Amount Paid to Vasquez's DNA Expert

The prosecutor asked Vasquez's defense expert, Taylor, on cross-examination, "How much have you billed the County of Los Angeles the last calendar year for your services?"  Counsel for Vasquez objected on the ground of relevancy, and the court overruled the objection.  Taylor testified it was "in the vicinity of $400,000."  The prosecutor also asked Taylor how much he was going to be paid for his testimony in this case.  Taylor responded that his hourly rate with the county was $300, so he expected to receive $600.  Further questioning revealed that Taylor had testified "[d]ozens of times"

16

in the last 12 months, but only once for the prosecution. Counsel for Vasquez did not object to this questioning.

During closing argument, in discussing Taylor's testimony regarding the DNA evidence, the prosecutor stated, "I'm sure he's a nice man, but he's a man who billed the county at least $400,000 in the last year and testified for the defense except for one case. So I don't know if that affected his testimony or not, but I do know that he was extremely reluctant to answer any questions about DNA directly." Again, counsel for Vasquez did not object.

Under California law "'[a] prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process, or involves deceptive or reprehensible methods employed to persuade the trier of fact.' [Citation.] A defendant asserting prosecutorial misconduct must further establish a reasonable likelihood the jury construed the remarks in an objectionable fashion. [Citation.]" (*People v. Duff* (2014) 58 Cal.4th 527, 568.) "'"To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct."' [Citations.]" (*People v. Barnett* (1998) 17 Cal.4th 1044, 1133; accord, *People v. Williams* (2013) 58 Cal.4th 197, 274.) "'Reversal of a judgment of conviction based on prosecutorial misconduct is called for only when, after reviewing the totality of the evidence, we can determine it is reasonably probable that a result more favorable to a defendant would have occurred absent the misconduct.' [Citation.]" (*People v. Williams* (2013) 218 Cal.App.4th 1038, 1073.)

Vasquez did not forfeit his claim of prosecutorial misconduct with respect to the amount paid to Taylor. Counsel for Vasquez objected to the prosecutor's first reference to the amount paid to Taylor, and the trial court overruled the objection. Although counsel for Vasquez did not request an admonition, the failure to do so is excused where "the court promptly overruled an objection and the objecting party had no opportunity to request an admonition [citation]." (*Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1412;

17

*People v. Bordelon* (2008) 162 Cal.App.4th 1311, 1323.)  Once the trial court overruled the objection to this line of questioning, further objection would have been futile.  Thus, the failure to object and request an admonition does not forfeit the claim of prosecutorial misconduct.  (*People v. Gamache* (2010) 48 Cal.4th 347, 373; *People v. Zambrano* (2004) 124 Cal.App.4th 228, 237.)[8]

The prosecutor's questions and argument, however, were proper.  "A prosecutor has wide latitude to challenge a defendant's evidence, and so long as the argument is fair comment on the evidence or a reasonable inference drawn therefrom, it is permissible.  [Citation.]"  (*People v. Gray*, *supra*, 37 Cal.4th at p. 216.)  We do not agree with Vasquez's contention that the prosecutor's emphasis on the fact the county paid for Taylor's expert witness fees was impermissible.  "Evidence Code section 722, subdivision (b) expressly provides that the 'compensation and expenses paid or to be paid to an expert witness by the party calling him is a proper subject of inquiry by any adverse party as relevant to the credibility of the witness and the weight of his testimony.'  [Citation.]  Defense counsel remained free to argue that the prosecutor, his investigators, and his expert witnesses were also paid from public coffers."  (*Ibid.*)  Similarly, "it is not misconduct to question an opponent's expert witness about payment for services or about the expert's testimony in prior cases involving similar issues."  (*People v. Price* (1991) 1 Cal.4th 324, 457; see, e.g., *People v. Monterroso* (2004) 34 Cal.4th 743, 783-784 [no prosecutorial misconduct where prosecutor commented on defense expert's "substantial fee, . . . history of testifying only for criminal defendants," and that witness was "'collecting good money'" for this testimony].)

Moreover, the thrust of the prosecutor's argument was that Taylor was well paid for his testimony in favor of criminal defendants, leading to a bias in favor of defendants.  For that reason, the prosecutor properly argued, Taylor was reluctant to answer questions

---

[8]     Because an objection and request for an admonition would have been futile, counsel's failure to make them does not constitute ineffective assistance of counsel.  (See *People v. Gray* (2005) 37 Cal.4th 168, 208.)

regarding the DNA evidence and his testimony was not credible. It is not reasonably likely "the jury construed the remarks in an objectionable fashion." (*People v. Duff*, *supra*, 58 Cal.4th at p. 568; see *People v. Dykes* (2009) 46 Cal.4th 731, 772 ["'we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements'"].) Nor was the prosecutor's comment, as Vasquez argues, an appeal to the jury's "passions, prejudices and self-interest" or an invitation to convict Vasquez as punishment for the use of taxpayer money.[9]

### 2. Referring to Facts Not in Evidence

Juli Watkins, the prosecution's DNA expert, testified that she found a small amount of male DNA on Jenny's external genital swabs, but there was not enough to identify the contributor. Watkins also testified that if the swabs do not find male DNA on a woman's vagina, then it could mean that there was no penis insertion. It could also mean that the man wore a condom.

The prosecutor argued in his closing argument that the most likely reason for the absence of Vasquez's DNA on Jenny's genitals was that he was wearing a condom. The prosecutor also argued the fact that sperm was found in trace amounts on Jenny's neck suggested that Vasquez ejaculated on her and then wiped her down. Counsel for Vasquez then argued that Jenny was mistaken about Vasquez inserting his penis in her vagina because there was no physical trauma and an absence of DNA. He added that there was no evidence that Vasquez used a condom, pointing out that no one ever found a condom wrapper at Jenny's apartment.

---

[9] Vasquez also claims the prosecutorial misconduct constituted federal constitutional error. "'Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights—such as a comment upon the defendant's invocation of the right to remain silent—but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" [Citation.]' [Citation.]" (*People v. Fuiava* (2012) 53 Cal.4th 622, 679.) Because we find no prosecutorial misconduct, we find no constitutional violation.

In his rebuttal the prosecutor made the following statements that Vasquez claims constituted misconduct:

"With respect to the condom, if the point is that because the police did not find a condom wrapper or a used condom, I'm asking you to assume that he used one. That's not [*sic*] a fair inference from the evidence. Obviously if a rapist rapes a woman and thinks enough about the evidence to wipe her down—

"[Defense Counsel]: Objection, misstates [*sic*] facts not in evidence.

"The Court: Overruled at this time. You may continue.

"[The Prosecutor]: I've already made the argument why I think the evidence suggests why he wiped her down. Because there's no visible semen. If he goes to the point of doing that, do you really think he would leave a condom wrapper with his potential DNA with him? No. He would take it with him. Just like he took . . . her bra and panties. So that's clearly what a criminal with that mind set would do."

"A prosecutor engages in misconduct by misstating facts or referring to facts not in evidence . . . . [Citation.]" (*People v. Ellison* (2011) 196 Cal.App.4th 1342, 1353; accord, *People v. Linton* (2013) 56 Cal.4th 1146, 1207.) Nevertheless, the prosecutor "enjoys wide latitude in commenting on the evidence, including urging the jury to make reasonable inferences and deductions therefrom." (*Ellison*, *supra*, at p. 1353; accord, *People v. Hill* (1998) 17 Cal.4th 800, 823.) "A prosecutor's 'argument may be vigorous as long as it is a fair comment on the evidence, which can include reasonable inferences or deductions to be drawn therefrom.' [Citation.]" (*People v. Edwards* (2013) 57 Cal.4th 658, 736.)

Although we agree that Vasquez did not forfeit this claim of prosecutorial misconduct (*Rayii v. Gatica*, *supra*, 218 Cal.App.4th at p. 1412; *People v. Bordelon*, *supra*, 162 Cal.App.4th at p. 1323), we reject it. The possibilities that Vasquez used a condom and wiped his semen off Jenny were reasonable inferences drawn from the

evidence and were permissible bases for argument. (*People v. Edwards*, *supra*, 57 Cal.4th at p. 736.)[10]

D.    *Instruction Pursuant to CALCRIM No. 362*

The trial court instructed the jury pursuant to CALCRIM No. 362 as follows: "If the defendant made a false or misleading statement before this trial relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt.   If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance.   However, evidence that the defendant made such a statement cannot prove guilt by itself."

Vasquez did not object to instruction with CALCRIM No. 362.  The People argue that Vasquez "forfeited his claim as to CALCRIM No. 362."  Vasquez argues that this failure did not forfeit his claim of error on appeal because the "instruction is alleged to be legally incorrect," citing section 1259 and *People v. Smithey* (1999) 20 Cal.4th 936.

We agree with Vasquez that he has not forfeited this issue.  We review any claim of instructional error that affects a defendant's substantial rights whether or not there was an objection to the instruction at trial. (See § 1259 ["[t]he appellate court may also review any instruction given . . . even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby"]; *People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012; *People v. Smithey*, *supra*, 20 Cal.4th at p. 976, fn. 7; *People v. Denman* (2013) 218 Cal.App.4th 800, 812 ["[w]hen the trial court gives an incorrect or incomplete instruction that allegedly affects the substantial rights of a defendant, it is reviewable even if no objection was raised in the trial court"].)  We cannot determine whether the defendant's substantial rights were affected, however,

---

**10**    Because there was no prosecutorial misconduct, any failure to request an admonition did not constitute ineffective assistance of counsel. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 120.)

21

without deciding if the instruction given was erroneous and, if so, whether the error was prejudicial. Therefore, we must review, and Vasquez has not forfeited, the merits of his challenge to CALCRIM No. 362.

Vasquez contends the instruction violated his due process rights by allowing the jury to make an inference of guilt unjustified by the facts on which the inference was based. (See *Francis v. Franklin* (1985) 471 U.S. 307, 314-315 [105 S.Ct. 1965, 85 L.Ed.2d 344] ["[a] permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury"].) The California Supreme Court has repeatedly rejected the argument that consciousness of guilt instructions such as CALCRIM No. 362 are constitutionally infirm because they permit "the jury to draw irrational and impermissible inferences . . . ." (*People v. Howard* (2008) 42 Cal.4th 1000, 1021; see also *People v. McWhorter* (2009) 47 Cal.4th 318, 377 [referring to CALJIC No. 2.03, which is similar to CALCRIM No. 362]; *People v. Stitely* (2005) 35 Cal.4th 514, 555 [CALJIC No. 2.03 "did not generate an irrational inference of consciousness of guilt"].)

## DISPOSITION

The judgment is affirmed.

SEGAL, J.[*]

We concur:

PERLUSS, P. J.                    ZELON, J.

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

22